IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 8, 2008

**STATE OF TENNESSEE v. HOSIE PERRY, JR.**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-08431     W. Fred Axley, Judge**

---

**No. W2007-00822-CCA-R3-CD - Filed July 15, 2008**

---

The defendant, Hosie Perry, Jr. was convicted by jury of two counts of first degree premeditated murder for which he received consecutive sentences of life imprisonment.  On appeal, he contends that: (1) the evidence was insufficient to sustain his convictions because there was no proof connecting him to the crimes other than uncorroborated accomplice testimony; (2) the trial court erred in admitting autopsy photographs of the victims; and (3) the trial court erred in sentencing him to two consecutive life sentences.  Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA McGEE OGLE, JJ., joined.

Brett B. Stein and Robert Chamoun, Memphis, Tennessee, for the appellant, Hosie Perry, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Ray Lapone and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The evidence presented at trial established that the victims, David McVay and Jessica Sisson, were shot and killed.  Sharon Coleman, McVay's mother, testified that McVay was twenty-one years old when he was killed.  According to Coleman, she heard that her son had been shot and went to the scene on Longmont Drive.  When she arrived, McVay and Sisson had already been transported to the hospital.  Later, she learned that her son had died.  At trial, photographs of McVay alive and deceased were submitted to Coleman for identification and then introduced into evidence.

Mary Barnes, Jessica Sisson's aunt, testified that Sisson had lived with her since she was two or three years old.  Barnes recalled that McVay and Sisson had a close friendship, like brother and

sister. Barnes was informed at the hospital that Sisson had died. Sisson was seventeen years old when she was killed. During the trial, photographs of Sisson alive and deceased were submitted to Barnes for identification and then introduced into evidence.

Louise Scott, McVay's aunt, testified that McVay came over to her house on Longmont Drive on July 13, 2005, to visit and eat. Around midnight, McVay left the house in order to walk Sisson home. Shortly thereafter, Scott heard gunshots. At the time, Scott thought she heard fireworks. However, Scott looked outside and saw people running. A few minutes later, someone came to her door and told her that McVay had been shot. Upon hearing the news, Scott ran down the street where she saw McVay and Sisson lying on the ground. According to Scott, McVay was still alive when she arrived. She held him and tried to get a response from him. However, he was gasping for air and could not talk or respond.

Officer Jerry Quinn of the Memphis Police Department testified that in the early morning hours of July 14, 2004, he was dispatched to Longmont Drive in Shelby County, Tennessee. He was told by the dispatcher that shots had been fired in the area and two people had been hit. When he arrived at the scene he observed that a large crowd had gathered. He then saw a young lady who appeared lifeless. Next to her was a young man. The man was alive but his breathing was shallow. Officer Quinn observed that both individuals had gunshot wounds, and he saw shell casings on the ground. The two individuals were eventually taken to a hospital by ambulance.

Joshua Parker testified that around 11:00 p.m. on July 13, 2005, he and a friend, Timothy Payne, were riding around in Parker's car. At some point, he received several phone calls from an individual named Raphael Love. According to Parker, he had met Love a few months earlier at school. Love had called Parker because he wanted Parker to give him a ride to a house on Frayser Boulevard. Love told Parker that the house was his aunt's house and that it had been "shot up." Parker stated that he did not believe Love but after receiving numerous phone calls from Love, he and Payne decided to drive by the house to corroborate Love's story. As they approached the house, they passed Love, who was riding in someone else's car. Love called Parker again and asked Parker to turn around and pick him up. Parker told Love that he already had a ride. However, the car Love was riding in stopped and Love got out. Love retrieved some garbage bags from the car and walked over to Parker's car and placed the garbage bags into the trunk of Parker's car. Parker then took Love to his aunt's house, and Love showed Parker and Payne the bullet holes.

Parker testified that Love asked to be dropped off at his cousin's house in Frayser. However, en route, they picked up an individual named Sedaris Walker. Love then decided that he wanted to show Walker the damage to his aunt's house, so they went back to the house. Afterwards, Love told Parker to drive to Breezy Point. En route, they saw the defendant. Love told Parker to stop the car and pick up the defendant. Parker complied and then at Love's insistence drove back to Love's aunt's house where they once again surveyed the damage. According to Parker, he then drove the men down the street to where an abandoned Cadillac was parked. Love, Walker, and the defendant exited Parker's car and walked over to the Cadillac, where they removed some garbage bags and put them in the trunk of Parker's car. Parker recalled that they drove around for a while but eventually

drove back to Love's aunt's house. When they arrived, Love, Walker, and the defendant got out of Parker's car and told him to open the trunk. Looking through his side view mirror, Parker saw Love holding a rifle. When Love got back into the backseat of Parker's car, Parker told Love that he did not want guns in the car. Love then called someone else for a ride.

Parker testified that after waiting for forty-five minutes for someone to pick up Love, Walker, and the defendant, Love convinced him to give the men a ride to the Timberlake area. Love told Parker that "we ain't going to shoot nobody, we just going to shoot in the air just to scare them." Parked testified that he believed Love and decided to drive the men to the Timberlake area. Parker recalled that he drove past Longmont Drive, pulled into a cove, and parked the car. Love, Walker, and the defendant got out of the car and retrieved the guns from the trunk. According to Parker, all three men were armed. Parker recalled that Love carried a rifle with a scope on it, and the defendant carried a shotgun. As the three men began to walk away, Parker told Love that he was going to leave. In response, the defendant turned around and told Parker that he had better not leave. Parker proceeded to back his car into the shadows and turned the engine off.

Parker testified that a few minutes after he parked his car he heard several rapid gunshots. He then saw Love, Walker, and the defendant running up the street. Love spotted Parker's car and yelled at Parker to "come on." Parker said he hesitated at first but then drove over to where the men were standing and picked them up. Parker noted that the three men were still armed. After driving a short distance, Parker stopped the car so the men could put their guns in the trunk. Parker recalled that he eventually dropped the men off at different locations as directed.

Timothy Payne testified similarly to Parker. Payne recalled that on the night of the murders he was riding around with his friend, Parker. He noted that he was talking to his girlfriend on the phone most of the night. Payne recounted that Love called Parker a number of times, and eventually, Parker talked to Love and drove over to a house. According to Payne, Love showed them bullet holes in the walls of his aunt's house and in a van parked in front of the house. Love was angry about the shooting and said he knew who had done it. Love got into the backseat of Parker's car and told Parker to drive to his cousin's house. However, they ended up driving to Walker's house. Upon arrival at Walker's house, Love got out of the car and went inside the house to talk to Walker. Payne stated that he and Parker stayed in the car. Payne said he was talking to his girlfriend at the time.

Payne testified that after about five minutes Love and Walker came out of the house and got into the backseat of Parker's car. Parker drove everyone back to Love's aunt's house. Once they pulled up, Love and Walker got out of the car and surveyed the damage. Payne recalled that Love and Walker were talking, but he could not hear the conversation. At this time, Payne saw the defendant walking down the street. The defendant walked over to where Love and Walker were standing, and the three men began to talk. After about five minutes, the three men got back into Parker's car and Love told Parker to drive to an abandoned Cadillac with flat tires located a couple houses down. Love, Walker, and the defendant exited the car and Love opened the Cadillac's trunk and removed a black garbage bag. Payne recalled that he thought the bag contained Love's clothing because Love had indicated that he had been kicked out of his aunt's house and wanted to go over

to his cousin's house. According to Payne, Love put the garbage bag in the trunk of Parker's car and told Parker to drive through the Timberlake area on the way to Love's cousin's house. Parker drove through Timberlake. Love said he did not see anyone so he told Parker to head back to his aunt's house. However, a few minutes after arriving at Love's aunt's house, Love asked Parker to go back to the Timberlake area. At this time, it was after midnight.

Payne testified that while driving through the Timberlake area, Love told Parker to stop the car because he saw someone. Payne said he assumed Love was talking about his cousin. Payne recalled that Parker stopped the car in a cove; whereupon, Love, Walker, and the defendant got out and went to the trunk. Parker popped the trunk open from inside the car, and Love removed the garbage bag. Love, Walker, and the defendant then walked down the street. A few minutes later, Payne heard a barrage of gunshots. Payne recalled that he and Parker were scared and Parker began to drive away. At this time, they saw Love, Walker, and the defendant running down the street. Love yelled for Parker to stop the car and Love, Walker, and the defendant piled into the backseat. Payne noticed that all three men were carrying guns. Walker had a shotgun, and Love and the defendant had assault rifles. As they were getting into the car, Payne heard the defendant say, "I think I shot somebody." Love told Parker to drive around the corner. Once around the corner, Parker stopped the car at Love's request and the three men put their guns in the trunk of Parker's car. Thereafter, Parker took the defendant home and then dropped off Love and Walker. Love took the guns out of Parker's trunk and took them inside his cousin's house. Payne said that he later learned that two people had been shot and killed.

Memphis Police Officer Demar Wells testified that on July 14, 2005, around 2:00 a.m., he conducted the investigation of the crime scene at the intersection of Windermere and Longmont. He found multiple spent shell casings, shotgun wads and shotgun shells. He also found ten 7.63 casings, which indicated the possibility that an assault rifle was used. Officer Wells noted that AK 47's, SK's and Mas 90 weapons use these casings.

Dr. Karen Chancellor testified that she was a forensic pathologist with the Shelby County Medical Examiner's Office. She reviewed the autopsy reports generated from the autopsies of the two victims, Jessica Sisson and David McVay. Dr. Chancellor testified that Sisson's death resulted from a single gunshot wound. One bullet had gone completely through Sisson's body. The bullet damaged Sisson's left lung, which resulted in hemorrhaging, and passed through her heart. Three photographs were entered into evidence. Two photographs depicted a gunshot wound to the front of Sisson's chest and her back. The other photograph was an autopsy identification photograph, showing Sisson's face and shoulders. Dr. Chancellor noted that Sisson's death was reported as a homicide.

Dr. Chancellor stated that McVay suffered from two gunshot wounds to his body. He received a wound to the inner aspect of his right arm and a wound to the right side of his chest, underneath the arm. According to Dr. Chancellor, the bullet damaged McVay's right lung and heart. Four photographs were entered into evidence. Two photographs depicted gunshot wounds to McVay's arm and chest. One photograph was an autopsy identification photograph, showing

McVay's face and shoulders. One photograph showed the bullet removed from McVay's body. Dr. Chancellor noted that McVay's death was reported as a homicide.

At the conclusion of the trial, the jury found the defendant guilty of two counts of first degree premeditated murder. Thereafter, he was ordered to serve two consecutive sentences of life imprisonment.

## ANALYSIS

### I. Sufficiency of the Evidence

On appeal, the defendant challenges the sufficiency of the evidence for his convictions for first degree premeditated murder. Specifically, the defendant contends that the trial court erred in denying his motion for judgment of acquittal because the testimony of Joshua Parker and Timothy Payne was accomplice testimony and not corroborated and therefore insufficient to support his convictions.

Initially, we note that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); *see also State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). Therefore, we address the defendant's argument under a sufficiency of the evidence standard of review.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001); *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Furthermore, accomplices cannot corroborate each other. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Typically, the test for determining whether a witness is an accomplice is whether he or she could have been convicted for the offense. *Id.*; *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).

The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. *Bethany v. State*, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978). When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide this issue. *Lawson*, 794 S.W.2d at 369. On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness is an accomplice. *Id.* If the jury finds accomplice status, then the issue of whether the witness's testimony has been sufficiently corroborated becomes a matter entrusted to the jury as the trier of fact. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

In the present case, the trial court found that witnesses, Joshua Parker and Timothy Payne, were not accomplices as a matter of law and that their status as accomplices was a question for the jury to decide. The trial court charged the jury as follows:

> An accomplice is a person who knowingly, voluntarily, and with common intent with the principal offender unites with him or her in the commission of the crime.

> If a witness was an accomplice in the crime, then his or her testimony must be corroborated. Corroborating evidence is evidence, entirely independent of the accomplice's testimony, which taken by itself, leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. . . . It is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated. Accomplice testimony cannot be corroborated by another accomplice's testimony.

> In this case it is a question for the jury to determine whether the witnesses Timothy Payne and Joshua Parker, were accomplices in the alleged crime. If you find from the proof that the witnesses were accomplices, then the defendant cannot be convicted upon the uncorroborated testimony of these witnesses. If you find that the witnesses were not accomplices, then you will judge the weight to be given to their testimony just as you do that of the other witnesses in the case.

In the present case, the evidence does not support the defendant's contention that Joshua Parker and Timothy Payne were accomplices to the murders. Their testimony regarding their involvement clearly places their accomplice status in dispute. Parker and Payne both testified that they were riding around together and eventually gave a ride to Love, Walker, and the defendant. Parker and Payne were not privy to the conversations between Love, Walker, and the defendant, and they did not know what the three men had planned. Parker and Payne's testimony also reflects that they became afraid of Love, Walker, and the defendant. After dropping the three men off near Longmont Drive, Parker testified that he told the three men he was leaving; whereupon, the defendant, who was holding a gun at the time, told Parker that he had better not leave. Accordingly, there is little, if any evidence establishing that Parker and Payne knowingly, voluntarily, and with common intent, united with the principal offenders to commit the murders. Whatever evidence implicating Parker and Payne as accomplices conflicts with evidence indicating their ignorance and innocence of the events surrounding the criminal acts. By its verdict, the jury obviously found that the evidence supported a finding that Parker and Payne were not accomplices to the murders. Accordingly, the defendant's argument in this regard is without merit.

Turning to the evidence presented at trial, we note that the defendant was convicted of two counts of first degree murder. First degree murder is defined in pertinent part as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a). Premeditation refers to "an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). Moreover, premeditation "means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*.

The jury in this case was not only instructed on the elements of first degree murder and lesser included offenses, but also on the theory of criminal responsibility for the conduct of another. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id*. § 39-11-401(a). One is criminally responsible for an offense committed by another when, "[acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id*. § 40-11-402(2). Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Dickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Viewing the evidence in the light most favorable to the state, the proof established that the murders of David McVay and Jessica Sisson were both premeditated and intentional and that the defendant knowingly participated in their murders. The proof shows that Love was angry at someone who had "shot up" his aunt's house. After surveying the damage done to Love's aunt's house, Love, Walker, and the defendant drove over to an abandoned Cadillac and retrieved some garbage bags containing Love's guns. After driving through the Timberlake area of Memphis for a second time, Love told Parker to stop the car near Longmont Drive because he recognized someone. Love, Walker, and the defendant then exited the car, armed themselves, and walked up the street. The defendant told Parker, the driver, not to leave. Soon thereafter, shots were fired and the three men ran back to the car, each carrying a gun. The defendant was heard saying, "I think I shot somebody." Both McVay and Sisson were shot near Longmont Drive and subsequently died from gunshot wounds. The jury in this case was instructed on the theory of criminal responsibility, heard all of the evidence, weighed the credibility of the witnesses, and found the defendant guilty of two counts of first degree murder. Consequently, we conclude that the evidence presented at trial was sufficient to support the defendant's convictions for first degree murder.

## II. Admission of Photographs

The defendant next contends that the trial court erred in admitting photographs of the deceased victims. The defendant claims that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice to the defendant, especially given that the defendant offered to stipulate to the fact that the victims were deceased. In rebuttal, the state argues that the trial court did not err in admitting the photographs because the defendant's stipulation did not erase the state's obligation to prove that the victims had been alive and that they had died.

Prior to trial, the defendant filed a motion *in limine* to exclude certain autopsy photographs of the victims. The defendant argued that the admission of the photographs would be prejudicial and told the court that he was willing to stipulate that the victims were deceased. The state argued that the admission of the photographs was necessary to prove as part of their case that the victims "were living persons, and at some point they died." Thereafter, the state announced that it planned to introduce additional autopsy photographs depicting the bullet wounds to the victims' bodies. The state noted that the pictures were not gruesome and were necessary to show the cause and manner of the victims' death. The defendant renewed his objection to the photographs, asserting that they were graphic and the probative value of the photographs would be far outweighed by any prejudicial effect, especially since the method of death was not in dispute. The trial court allowed the admission of the photographs, finding that the defendant's stipulation did not erase the state's obligation to prove that the victims had been alive and that they had died. The court also noted that the photographs depicting the bullet wounds were not overly gruesome and relevant to the autopsy report.

Upon review, we note that the appellate record does not include the autopsy photographs presented to the jury and entered into evidence by the state as exhibits 2, 4, 18, 19, 20, 21, and 22. Obviously, without seeing the photographs, this court cannot gauge their relevance or their potential

for unfair prejudice. Significantly, the defendant, as the appellant, has the burden of presenting this court with a record that conveys a fair and accurate account of what transpired with respect to the issues raised on appeal. *See State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993); *see also* Tenn. R. App. P. 24(b). Without a proper record this court is precluded from considering the issue and must presume that the trial court's rulings were correct. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Therefore, the defendant is not entitled to relief on this issue.

### III. Sentencing

The defendant next contends that the trial court erred in ordering him to serve his life sentences consecutively because he was only fifteen years old when he committed the offenses and had regular problems as a teenager. The defendant further submits that because his actions resulted in the simultaneous death of both victims, his actions should be considered as one act for sentencing purposes.

When a defendant challenges the length and manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401. This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. *See* Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if: (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

A trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Therefore, pursuant to this code section, a trial court may impose consecutive sentencing if it determines any one of the following criteria applies:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

*Id.* The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. However, if the trial court imposes consecutive sentencing based solely upon a finding that the defendant is a dangerous offender, the court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). Additionally, the trial court should consider general sentencing principles including whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). It is within the sound discretion of the trial court whether or not to impose consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

In ordering consecutive sentences, the trial court found the following:

> In looking at 40-35-115, I'm looking at just the . . . adult [type] convictions, August '03. Probation, he violates it within sixty days. Inability to conform his behavior to the requirements of the law. Assaults in school. On school property without consent.
>
> . . . .
>
> I'm looking at the . . . weapons; one was a shotgun and one was the AK 47, which is military assault rifle. And not only the weapon, but the ammunition, the 7.62, is high powered. . . .
>
> . . . .
>
> And, when you look at the nature and circumstances of the offense; killing two teenagers who had no connection with this defendant. One, having been shot a hundred yards with an AK 47. While that is not uncommon with that weapon, that

-10-

ammunition would travel a hundred yards. It is before this Court, unusual, that unless you practice shooting that weapon, you would have difficulty killing two people at a hundred yards.

And, yet, he did it. The jury found that he did it. His criminal history at Bolton High School. One of our better high schools, is very, very impressive.

And, certainly, I have to look at the severity of the offense. I have to look at the nature and circumstances of the offenses and how it occurred, why it occurred, what his considerations were in shooting two people he didn't know, he just saw [them] at a distance and decided to kill them.

The jury properly found that he committed the offense of murder in the first degree. I properly find . . . that, under the law defined and explained by this Court today, that . . . those sentences shall be served consecutive.

Based on our review, we conclude that the trial court did not err in imposing consecutive sentences. First, a review of the defendant's juvenile record shows that in August 2003, he committed the offense of possession with intent to sell marijuana and was placed on supervised probation. In October 2003, he violated the terms of his probation by becoming involved in gang activity, running away from home, and truancy. His probation was reinstated, but a month later he became embroiled in a fight at school and was subsequently charged with assault in March 2004. The defendant's probation was again reinstated, but in May of 2004 he got into another fight at school. As a result, he was placed in the Hanover House Program. In September of 2004, the defendant was arrested for trespassing on school property. At that time, he was taken out of Hanover House Program and placed into the Shelby County Training Center. In January 2005, the defendant was returned to the custody of his mother. However, in July of 2005, the defendant was reported for violating his curfew and running away from home. Also, in July, the defendant participated in the aforementioned murders. As such, the record supports the court's finding that the defendant had an extensive criminal history. This finding alone justifies consecutive sentencing. *See* Tenn. Code Ann. § 40-35-115(b)(2). Additionally, while we note that the court's comments regarding the defendant's familiarity with the AK rifle were speculative, we discern no error in the court's finding that the defendant was a dangerous offender. Accordingly, the defendant is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing review, we affirm the defendant's convictions and sentences.

_____
J.C. McLIN, JUDGE

-11-